I would like to reserve approximately five minutes of my time for rebuttal. I will like to focus the court's attention, if I could, this morning on what I consider to be the seminal issue in this case, the error made by the district court when it granted summary judgment as to the lawfulness of Kenneth Lassiter's arrest. The issue is important because that ruling led to a cascade of additional rulings that, in our view, essentially deprived the Lassiters of their Seventh Amendment right to have the material disputed facts decided by a jury. This ruling caused the court, in my view, to make additional summary judgment rulings that affected the Lassiters' ability to present their entire case involving the other defendants to the jury. The district court found, in essence, that Mr. Lassiter's – well, sorry, Ted. The district court based its ruling on the Washington Obstruction Statute, which is a unique crime because, much like excessive force cases, it involves interactions between an officer and an individual. And it also implicates core constitutional protections, in this case, the First and Fifth Amendments. Let's kind of get to the facts here. Yes. There was a 9-11 call. Yes. And you've read that, I'm sure, more than once. Yes. And I have also. Yes. And it certainly gave cause for the police to go to that house. We are not contesting the validity of the district court's determination that the entry was lawful or granting the officers qualified immunity for the entry. Yes. So we get them into the house. Yes. All right. But there was some implication in that 9-11 call that possibly a gun might – not a gun, a knife might be used because she said something about the possibility of slitting her throat. So there he is, standing in the kitchen doorway, backing up toward knives. Do we all agree that those are the facts? Those are not the facts. As a matter of fact, that's where I was going to – Aren't they the facts? I'm sorry? Why aren't they the facts? Because Mr. Lassiter said that he was approached by – the first point is that this whole exchange took place in a very short period of time, about 18 seconds, from the time Officer Van Sanford enters the house, crosses the living room to confront Mr. Lassiter, who, through his testimony at trial and the affidavit, was standing by a chair, didn't move. What Officer Van Sanford said – sorry, what he wrote in his report actually varies from what he said at trial, and it also varies from the district court's determination that there was probable cause to arrest Mr. Lassiter for obstructing. The difference is that what the district court said was that Mr. Lassiter refused to sit down. When Officer Van Sanford testified at trial, he did not claim that that was the reason why he was going to arrest Mr. Lassiter. What he said was that it took maybe five seconds from the time that he began talking to Mr. Lassiter, and, again, the officer does not claim that Mr. Lassiter's comments to him obstructed the officer's investigation. What the officer says – he saw Mr. Lassiter, he said, moving towards the kitchen at trial. He closed the distance towards him and that he grabbed Mr. Lassiter's arm to keep him from going any further. Again, these are facts Mr. Lassiter has repeatedly asserted that were not true, that he did not move. He had not moved the entire time from the point the officer came into his home. What happens next, according to Officer Van Sanford's testimony at trial, again, which is not what the district court based its finding that the arrest was lawful on, what Officer Van Sanford said is that he didn't intend to take Mr. Lassiter into custody or arrest him at that point, but it was when Mr. Lassiter reacted to the officer laying hands on him – So the officer was the first person to cause physical contact, and Mr. Lassiter, according to Officer Van Sanford's trial testimony, reached out and grabbed the officer's arm. Now, at this point, Officer Van Sanford said that Mr. Lassiter was resisting, and so for that reason he took Mr. Lassiter to the ground, and at this point the other officer, Officer Thuring, joined in in subduing Mr. Lassiter. So the peculiar circumstance of this case is that the district court granted summary judgment, finding as a matter of law the facts were uncontested regarding Mr. Lassiter's arrest for obstructing by failing to sit down when asked to do so. In fact, that's not what the officer ever testified, either at – through his declaration. He never said that in his sworn report. He never said at trial that the reason Mr. Lassiter was arrested was for obstructing by failing to sit down. He gave a very different characterization. This court has consistently held that where there are genuine material facts that are in dispute, the issue of whether the arrest was based on probable cause, that a reasonably prudent police officer in the same circumstance would have felt that there was reason to arrest, is an issue for the jury, and this court has refused to grant qualified immunity. We believe that holding, which is latest stated in Tories v. Los Angeles, should have been the holding of the district court. And when the district court made its determination, it also failed to follow the rules for summary judgment because when the district court made its determination, it basically took inferences adverse to Mr. Lassiter, the non-moving party, when those inferences should have been in favor of Mr. Lassiter. Could the officer, based on the 9-11 call, simply have arrested Lassiter? No. In this case, no one – there is no police export called by either side, and we had submitted a report and declaration testimony of Lee Libby as our law enforcement expert, and no one's expert claimed that a police officer would have probable cause to arrest Mr. Lassiter simply because of a 9-11 call. As the officers testified, they didn't have enough information themselves to make a determination as to whether an act of assault or some other crime that would be defined as domestic violence had actually occurred in the home, that all they could tell was that there was yelling inside and that someone might have been agitated. The officers' rationale, as they stated many times in affidavits and their sworn reports for entering, was they needed to investigate to see what had happened so they could then make a decision. So it's clear, I think from the record, that there was no facts existing in the minds of these officers, and if you assume that their statements regarding what they knew outside were accurate, it would suggest that there is no information that would allow a reasonably prudent police officer in the same circumstance to believe that probable cause existed to arrest anybody for any crime at the time they entered the home. The district court interpreted the following exchange between Mr. Lassiter and the officer as giving rise to obstruction. And that first comment was by the officer, why don't you have a seat over here for me, to which Mr. Lassiter replied, no, I'm not here to discuss this with you. The district court should have taken the inferences in favor of Mr. Lassiter and found that statement to indicate that Mr. Lassiter was refusing to talk to the officer, not refusing to sit down, because, again, the statement was, why don't you have a seat over here for me, which doesn't appear to be a command. It appears to be some sort of request, and it followed the statement of the officer asking him what's going on, and a reasonable person, a reasonable police officer, I should say, in that circumstance, would understand Mr. Lassiter's response to be, I don't want to make a statement. The next five seconds, there were two other exchanges between the officer and Mr. Lassiter. Officer Van Samper says, okay, let's have a seat. We're investigating a possible assault, okay? We're not leaving. Mr. Lassiter's answer was simply, then he says right after that, have a seat here. Sir, I'm not going to tell you again. We're not playing games with you. Mr. Lassiter's response was, who are you? This takes place in about five seconds. Mr. Lassiter, according to his testimony, he has not moved. He's trying to figure out why these people are in his home. He has no reason to believe that someone's called the police. He has no understanding as to why they're there. And his testimony is, at this point, Officer Van Samper leans into him, knocks his glasses off, and the next thing he knows, he's on the floor. Now, again, the important point is that while the district court relied on that exchange, those three sentences I've just read to the court, that's not what Officer Van Samper ever said was the basis for Mr. Lassiter's arrest. There is no Washington case, there's no precedent cited by the appellates for the proposition that, as a matter of law, a person commits the crime of obstructing the city of Washington when they simply momentarily wait when confronted with a police officer who's asking a bunch of questions that don't appear to be clear commands and that we contend are so ambiguous that a reasonable person would not necessarily understand them as a command and a reasonable police officer making those statements would understand. The person is expressing confusion. Now, the issue of excessive force was allowed to go to the jury. That's correct. And what was the evidence that was presented in respect to excessive force and the jury found that it was not? Well, the difficulty with this case was that the Lassiters wanted to present the entire 15-month saga that resulted in them being prosecuted twice criminally, both cases being dismissed. What the jury was actually allowed to hear was a very short exchange between Mr. Lassiter and the police officer in which the district court told in instruction number 13 the jury that the conduct, the arrest I should say, was lawful three times. The difficulty for Mr. Lassiter was that he was trying to explain that he didn't do anything, he didn't move the officer's version of what he did, which was moving towards the kitchen, and it was totally not true from his perspective. And instead of the jury being allowed to make that important decision right then and there about who's credible, there's a lot of things going on that we believe should have allowed the jury to make a determination that the officer's reports simply weren't credible and their testimony would not be credible because they wrote these reports, textbook examples of how you make an obstructing arrest and the facts that support an obstructing arrest, but they're not true. The tape recording is completely inconsistent. There were major material discrepancies between what the officers wrote in their reports and what actually occurred when you listened to the tape recording. But getting back to the jury was allowed to consider whether there was excessive force. That's correct. Lassiter's could put on any evidence that they wanted. The cops could put on what they wanted. It went to the jury. So they found that there was no excessive force. And we believe that the jury's finding resulted from the confusion of being told, on the one hand, they were the triers of fact and they got to make the decisions as to what happened. On the other hand, being told from the court's instruction and several times in opening statement and closing statement by defense counsel that what the officers did were lawful. But the two are unrelated. I mean, whether you have probable cause for an arrest is immaterial to whether there was excessive force and vice versa. That is correct. I mean, you can have excessive force and have probable cause. Right. Excessive force was not the heart of the Lassiter's case. The heart of the Lassiter's case had to do with the fact that the officers wrote what we view as completely fabricated, intentionally fabricated reports to cover up other things, including the excessive force. The excessive force claim was essentially that Mr. Lassiter had received some bruising and abrasions to his hand. We weren't going to bring this case to a jury on that basis. This case was about the more fundamental issue, which is that law enforcement officers had done sworn reports in which they said things that were demonstrably not true, and that those reports had been relied upon by prosecutors two times to charge Mr. Lassiter and his wife with criminal offenses. Neither offense was proven to a jury because one was dismissed by the court with prejudice on the state's motion or the city's motion, and the other one a Superior Court judge found to be baseless. That was the case. You may want to reserve some time. Thank you. Who's up first? John Zender. Okay. Mr. Zender. Please, the Court. John Zender representing Officers Thurding and Van Sanford. And by way of explanation, three of the respondents are splitting their time in five-minute increments, and I am obviously going to take the first five minutes. I'll be addressing my comments to the issue of the arrest and leave the other issues to my colleagues. I'm glad that the court started off by observing why the officers were there. And, Your Honor, you did have it right. There was a reference also to a gun. There's a reference on the 9-1-1 tape to a gun, to a knife. In fact, Mr. Lasseter's own voice is captured on the tape actually making a threat that he would hurt someone, not Ms. Lasseter, but certainly someone. So the officers have that in mind. This is a situation where there's some urgency, there's some concern, a situation where decisions need to be made very, very quickly. You know, in listening to counsel's argument, I actually was going to finish with this, and actually I decided to lead with it. There's a very interesting statement made, which I think betrays plaintiff's appellant's entire position here before this court, and that is with respect to whether that arrest was lawful. The court should take time to look at page 11 of the appellant's reply brief where, and I'm going to just quote this, this hyperbole raises another option that Officer Van Sanford could have explored. He could have temporarily restrained Mr. Lasseter until he had completed his investigation, and then having determined that there was no domestic violence and no threat to safety, he could have released Mr. Lasseter. Well, in fact, that is exactly what the police officers did in this situation, and it was only after seizing control of him in his resisting arrest, which I would point out the jury found there was no excessive force. The assertion was, no, I didn't resist arrest. Well, obviously the jury found there must have been some resisting. He did have some bruises and some marks from handcuffs on his wrist. He found there was no excessive force. The leading case that the plaintiffs, I'm sorry, again, the appellants rely upon is the McKinney case, and the McKinney case itself actually highlights for us just how different this situation must be for officers in a situation such as this to be found to not have probable cause to arrest for obstruction. Recall McKinney is the case. This is McKinney v. Nielsen in 69F3rd. McKinney is the case where the individual in Berkeley is riding with chalk on the sidewalk, and police officers come by in an unmarked police car and yell at him to stop doing that, and he just simply very quickly underlines his last statement that police get up and they arrest him. What the court says in that case is it focuses on the very circumstances of that arrest and circumstances involved. The circumstances are so incredibly important, and I'll quote from the court when it highlights and points out just how important the circumstances are, which says, Of course, people must obey the police in most situations, but here the police overreacted to McKinney's momentary disobedience. What was involved in McKinney is different from here. This is a summary judgment case. I mean, this aspect is on summary judgment, isn't it? I'm sorry. The arrest issue is a summary judgment ruling. It didn't go to the jury. Correct. That is summary judgment. Right. So counsel has been arguing that the facts that are put forward by the police officers were lies, that their report lied, and the tape doesn't support the command to stop. At most, it says sit down, and that he says he wasn't backing away. So you're saying, well, they effectively conceded their case by saying that he could be temporarily restrained, but he wasn't temporarily. He was taken down and put on the floor. So what's your answer to why there isn't at least a disputed issue of fact, that the jury should have now then heard what you're trying to tell us now, decide between these two sets of facts and see whether or not this was justified? Okay, well, that's a separate issue. That is the issue of excessive force. No, it isn't. I'm talking about the cause to arrest him, to put him under physical restraint by taking him down. Well, that's established by listening to the tape itself. And recall, again, what the tape says. We keep getting this argument that there's unambiguous statements made to Mr. Lasseter that he didn't know what was going on. But look at the tape itself and what's stated. Officer Van Sanford comes in and says, what's going on? Mr. Lasseter says nothing in response. Officer Van Sanford, nothing. We're going out here and you're yelling and screaming and going to town. Why don't you have a seat over here? Now we'll concede to counsel. If it stopped right there, there's a real question about whether this officer is making a command for Mr. Lasseter to do something. But it doesn't stop there. This isn't just a situation where he's asking him to speak with him. There's something more to it. And it goes on. Mr. Lasseter, no, I'm not here to discuss it with you. Officer Van Sanford, okay, let's have a seat. We're investigating a possible assault, okay? We're not leaving, all right? But it doesn't stop there. He's now explained to Mr. Lasseter why he's there. He's not going to go. He doesn't ask him to have a seat. He says, have a seat. Mr. Lasseter's response, uh-huh. Next response by Officer Van Sanford, have a seat here. Sir, I'm not going to tell you again. Then there's the gap in the tape. We're not playing games with you. No reasonable person could hear that and think that an officer is giving anybody an option. I mean, for goodness sakes, from the time we were children, when we hear those kinds of words from our parents, we know the boom is going to be lowered if we don't stop what we're doing. You bet. You're going to get a boom lowered on you by coaching. Yes, I am. I am. I'm going to stop here. Thank you. Take a seat. Good morning. May it please the Court. My name is David Horton. I represent the City of Bremerton and Robert Forbes, its former police chief. Plaintiffs claim the investigation conducted by the police department into the officer's conduct was insufficient, but the evidence does not show a custom, policy, or practice   that condoned or ratified any misconduct. Merely not investigating further is not a basis for liability. The cases indicate there must be something more, and in this case there is no evidence of something more. The Lassiters rely on the Larez case, but Larez does not support their position. At page 18 of their reply brief, they state, that the police department had a policy or custom of using excessive force. But that's not what Larez says. The quote isn't found nowhere in the Larez opinion. What Larez actually holds is that there was sufficient evidence to the jury But in this case, we don't have any evidence of callousness or reckless indifference. Chief Forbes, once he got the allegations from the Lassiters, put the officers on administrative leave. He had the Washington State Patrol, a separate agency, conduct an investigation. He had the officers' reports, and he had the Lassiters' version of the events from Mr. Smith's letter. Mr. Smith stated in his argument that the heart of this case was fabricated evidence. The Washington State Patrol concluded that there was insufficient evidence of perjury or false swearing in the reports by the officers. So the investigation done at Forbes' request showed, to him at least, that the heart of the case was that there was nothing there. The expert in Larez that the Lassiters cite to and say, we had an expert that said basically the same thing. But the expert in Larez gave also empirical evidence that a citizen complaint before the Los Angeles Police Department would not be sustained. In contrast, the city of Bremerton disclosed thousands and thousands of pages in discovery to the plaintiffs, yet the plaintiffs were unable to point to a single case where the city of Bremerton didn't investigate a citizen complaint that should have been sustained. So instead of just opinion, the Larez court had facts that showed that this policy or practice was rampant in the Los Angeles Police Department. That was before I was on the police commission. I want the record to show that. And so they can't prove under that prong. The other prong where you can get liability for a single act is something more, is where the single act is so blatant and so outrageous that it shows that the police knew that they weren't going to get disciplined for doing this because they had improper training or supervision, where they go into a situation much like in Larez and they do things that are just completely outrageous and unreasonable. And here we don't have that. We have the officers acting reasonably in there. And if you listen to the tape, that's what you'll hear. You'll hear the officers be polite and ask if they want to make a complaint. They call for their supervisor. The tape shows that their training was sufficient and that there was a policy that they knew their actions were going to be under scrutiny, even if there wasn't going to be a tape there. The district court orders on summary judgment were correct with regard to the city and Chief Forbes, and we would ask the court to affirm the trial court. Thank you. Thank you, Mr. Portman. Good morning, and may it please the court. I'm Mark Jobson. I'm with the Washington State Attorney General's Office, and I'm here on behalf of the Kitsap County Deputy Prosecutors Cassad, Mitchell, and Bradley. The plaintiff's opening brief has given up all claims against Cassad and Bradley, so I'm going to address my argument only to Deputy Prosecutor Mitchell. Their basis for their claim is 42 U.S.C. 1983, and our response to that, to the trial court, is that Deputy Prosecutor Mitchell is entitled to qualified immunity under the clear decisional case law of both the U.S. Supreme Court and this circuit court, the only conduct that is arguably not absolutely immune. Have you looked at the Supreme Court's recent decision in the Vandy Camp case? I have. Do you think that reads on this case at all? Well, I think the court might want to take a look at that case, but I'm not going to rely upon it because our argument to the trial court was that Mitchell was entitled to qualified immunity rather than absolute immunity. I didn't file a cross-appeal on that, so I'm not going to argue today that Mitchell is entitled to absolute immunity. I think Vandy Camp might change that decision if I were to make that decision today, but I'll rely on the arguments that I made to Judge Leighton. Thank you. Mitchell acted, according to Judge Leighton's reading of the record, as a complaining witness rather than as a prosecutor when he signed a certification for determination of probable cause. That's in the record at ER 508. That's the critical document that the plaintiffs complain about. So does that make qualified immunity turn on whether his misstatement about Mr. coming to the door instead of Mrs. and omitting to tell the court about the prior dismissal? Does it come down to whether those were material omissions or misstatements? Well, that's an excellent question. I would like to point out that the certification for determination of probable cause was signed by Mr. Mitchell at the same time that he signed the information. And the information in this case, he's got absolute immunity for signing the information, according to the Kalina case. Their claim against Mr. Mitchell is that he improperly certified that he had probable cause to file these charges as stated in the information and as supported by the police reports. He signed the certification for probable cause, and he did, in fact, make what I would argue is a non-material mistake of fact when he said that Mrs. Lassiter did something when, in fact, it was Mr. Lassiter, or I may have that reversed. But the trial court decided that that was not material because it didn't make any difference to his reasonable belief that he had probable cause for the charges that are stated in the information. So I think that mistake of fact makes no difference whatsoever. Even if he's got qualified immunity on the 1983 claim, he doesn't necessarily have it on the state law malicious prosecution claim. Well, that's correct. So Kalina would seem to indicate that that's not available since it wasn't an official duty to sign that certificate. So is there any basis for qualified immunity on the state law claim? Yes, there is. Well, there are two bases for that. First of all, I don't think that this court should decide the question of state law qualified immunity. That's not necessary here, and it isn't necessary here. Judge Layton decided that it wasn't. No claim on the merits. No claim on the merits, correct. Whether the district court should exercise pendent jurisdiction or not over a state law claim after the federal law claim has been dismissed, this court has repeatedly said we choose not to do so, and that's the direction that Judge Layton followed in this case once he decided that there was no basis for the 1983 claim. However, I would further argue, and did in my brief, that he has qualified immunity under state law, under state case law, because he was acting according to the procedures in their office at that time. Even though state law doesn't require him to sign that certification, that was their procedure at the time. Okay. I'm sorry. That's just my bad memory. Did Judge Layton dismiss the state law malicious prosecution claim because he didn't think it stated the claim on the merits, or did he dismiss it on the basis of declining to exercise pendent jurisdiction? I believe the former. I believe he decided that the state law qualified immunity applied. I might be corrected on that, but this Court might independently decide not to review that question. He did not decide the case, that on the merits. I just can't remember. He didn't decide that claim on the merits, in other words. I believe he did. Yes, you misheard him. I did mishear him. Yes. Thank you. I would like to close, and I notice I'm running out of time. I would like to close by stating that I think that this case, as pertains to Deputy Prosecutor Mitchell, is clearly determined by Cruz v. Kauai County. A 2002-1983 claim against a prosecutor in Hawaii, who it was determined in that case acted as a complaining witness and made a false and material statement of fact in a declaration. The Court determined in that case that that prosecutor was entitled to qualified immunity because there was no clearly established case law, and Mr. Mitchell is entitled to the same protection. And the difference between that case and this is that Mr. Mitchell made no false statement of fact, nor did he mislead the Court at any time. Okay. Thank you, Mr. Chapman. Mr. Smith will equalize out the time. Give you another minute on top of this. Take a couple of minutes. Thank you. Let me try to address the comments in reverse order. If I could begin with the claim regarding Mr. Mitchell. The certification of probable cause was materially false because in it, Mr. Mitchell, as a probable cause witness, said that there was probable cause to believe that, in essence, Kenneth Lassiter tampered with the tape recording. The District Superior Court found, and that was a specific issue before the Superior Court, that there was no evidence to support Mr. Mitchell's statement that Mr. Lassiter, there was probable cause to believe Mr. Lassiter tampered with the tape. The Washington State Patrol detective who prepared the report that Mr. Mitchell appeared to be relying upon in his certification testified in his testimony that Mr. Mitchell did not tamper with the tape recorder. He made no representation to anyone that Mr. Lassiter was the person who tampered with the tape recording. He was simply looking at whether, in his view, there was sufficient information to allow charges to be brought against the two officers for false swearing or perjury. With regard to Chief Forbes, the issue that Lassiter's raised was deliberate indifference to the violation of Lassiter's civil rights. No one is going to stand up and tell this court that it is reasonable for police officers to make false statements and sworn reports about events that take place. Everyone understands that courts, jurors, the whole criminal justice system relies on the accuracy of police reports. That's included in policy for the Bremerton Police Department. You say that they're relying on false reports. Is this in aid of your Devereux argument or some other? It's actually that and our. So was that argument made in the district court? I don't see it. I could. But I've already messed up once. No, no. I'm messing up twice. I won't be able to find the exact page, but at the last two pages of our opposition to the motion to dismiss Chief Forbes. That wasn't a front and center theory in the district court. My recollection is that we really never got a chance to carve out the various substantive and due process constitutional violations that we claim supported our claim. And with regard to Lassiter's, Mr. Lassiter's arrest, our central question has always been what crime had Mr. Lassiter committed that allowed Officer Van Sanford to use force to bring him to the floor? No crime has ever been argued other than somehow feeling to do something like sit down would be obstructing. We believe there's no law for that. Thank you. Okay. Thank you. All counsel. Just argued.  Kathy, could you do me a favor? Oh, I love this. I wonder if you can take him a minute. Thanks. Thank you.
judges: Fletcher, Rymer, Fisher